J-S02005-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JOSHUA BOWEN | : | |
| | : | |
| Appellant | : | No. 3159 EDA 2016 |

Appeal from the PCRA Order September 22, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-1200331-2004

BEFORE:  BOWES, J., NICHOLS, J., and RANSOM, J.*

MEMORANDUM BY BOWES, J.:                **FILED MAY 21, 2018**

Joshua Bowen appeals from the order dismissing his second PCRA petition as untimely.  We affirm.

We previously set forth the facts underlying Appellant's convictions in our decision affirming his judgment of sentence, which we adopted from the trial court opinion.

> On the night of August 21, 2004, [Appellant] (also known as "Wop Wop") and Jermaine Goss fought over five dollars ($5.00) that Goss owed [Appellant] for a bag of marijuana Goss had previously purchased from [Appellant]. The fight took place as a group of people gathered at the corner of 15th and Hazard Street, Philadelphia. The fight initially began as a verbal confrontation but escalated when [Appellant] punched Goss. The two men wrestled each other to the ground where they continued to yell at one another. The fight ended.
>
> [Appellant] got up, entered his house, located at 2538 Hazard Street, but when [Appellant] reemerged from the house, he appeared to be holding something underneath his shirt in the waistband of his pants. [Appellant's] neighbor, Keith Furman,

_____

* Retired Senior Judge Assigned to the Superior Court.

testified that the object fell from the waistband of [Appellant's] pants down his leg and he was able to identify the object as a .9 millimeter gun. By this point, Jermaine Goss had left the immediate area and was at his house located at 1510 West Hazard Street. The gathered crowd broke up soon thereafter.

On the following day, August 22, 2004, [Appellant] approached Jermaine Goss, Keith Furman, and another man, "Danny", who were sitting on the front steps of Furman's house, located at 2532 North 15th Street. [Appellant] told Furman that he was still angry over the fight that took place the night before and that he should have shot Furman the night before. Furman laughed in response. "Danny" left and [Appellant] left.

[Appellant] entered his home, 2528 Hazard Street and on reemerging from his house he told Goss that he was going to die because he owed [Appellant] money. [Appellant] told Furman that he was also going to die because he would be a witness to Goss's murder. After saying this to the two men, [Appellant] once again went into his house only to come out, carrying a telephone. [Appellant] placed a call and once again approached the two men sitting on the steps. As [Appellant] approached the two men, two other men approached Goss and Furman as well. One of the two men asked [Appellant] if these were the "boys" giving [Appellant] trouble. [Appellant] responded that yes, these were the boys giving him trouble.

Upon hearing [Appellant's] answer, one of the two unidentified men pulled a gun from his waistband. [Appellant] also pulled a .9 millimeter gun from the waistband of his pants. Seeing this, Furman got up and ran north on 15th Street towards Lehigh Street. As Furman reached Oakdale Street, he heard ten (10) gunshots. Furman continued running until he got to the intersection of 30th Street and Lehigh Street, because that was the area where he believed Jermaine Goss's birth father lived. Furman was able to find out where Goss's father, Allen Goss, lived from a woman on the street. Furman found Allen Goss and told him that he and his son were approached by "Wop Wop" and two other armed men outside of Furman's house, that he ran and that he had heard gun shots.

Police Officer Danielle White arrived at 2530 Hazard Street where she found Goss, gasping for air, lying in a puddle of blood. Goss was transported to Temple University Hospital where he

died. On August 23, 2004, the day after the murder, Philadelphia Police picked up Furman for questioning. Furman made a statement to police and agreed to have it videotaped. [Appellant] was then arrested the same day.

*Commonwealth v. Bowen*, 918 A.2d 782, 2956 EDA 2005 at *2-3 (Pa.Super. 2006). Appellant did not file for further review with our Supreme Court. Therefore, his judgment of sentence became final thirty days after our decision, *i.e.*, January 12, 2007.

Appellant filed a timely PCRA petition, and appointed counsel filed a no merit letter and received permission to withdraw. The petition was denied on October 2, 2008, and Appellant thereafter filed a *pro se* notice of appeal from the order, which was docketed at 2957 EDA 2008. We ultimately dismissed that appeal on April 7, 2010, for the failure to file a brief.

On March 7, 2011, Appellant filed the PCRA petition at issue herein, seeking reinstatement of his right to appeal the October 2, 2008 dismissal of his first PCRA petition. The petition lingered, prompting Appellant to file supplemental petitions in 2012 and 2015. The PCRA court issued a notice of intent to dismiss on May 27, 2016. Following Appellant's objections, the PCRA court thereafter dismissed the petition on September 23, 2016. Appellant filed a timely notice of appeal. Appellant complied with the order to file a Pa.R.A.P. 1925(b) statement, and the PCRA court issued its responsive opinion. The matter is now ready for review of the claims raised by Appellant:

> I. Whether Appellant's incompetence qualifies under the statutory [newly]-discovered fact exception, on the basis that his incompetence rendered Appellant unable to timely discover the

- 3 -

factual basis for his post conviction claims on appeal, following the dismissal of his initial post conviction collateral relief act under the purview of 42 Pa.C.C. §9545(b)(1)(ii)?

II. Whether Appellant is entitled to the reinstatement of his PCRA appellate rights as a result of Attorney Lammendola's abandonment of Appellant during his initial post conviction collateral relief act proceeding?

III. Whether Appellant's mental incompetence raises material issues of fact requiring a hearing pursuant to Pa.R.Crim.P. 908(a)(2)?

Appellant's brief at 2.

Generally, a petition for relief under the PCRA must be filed within one year of the date the judgment of sentence became final. Where, as here, the petition is facially untimely, the PCRA petitioner is required to allege and prove an exception to the one-year time bar. These exceptions are:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii). Additionally, any petition seeking to invoke one of these three exceptions "shall be filed within 60 days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2). "This time

constraint is jurisdictional in nature, and is not subject to tolling or other equitable considerations." ***Commonwealth v. Spotz***, 171 A.3d 675, 678 (Pa. 2017) (citation omitted).

Presently, Appellant relies on the § 9545(b)(1)(ii) exception. He alleges that the pertinent newly-discovered fact is that he was mentally incapacitated during the time frame in which his brief was due. In support, Appellant relies upon the mental health evaluation which was prepared in advance of sentencing. The report states, in pertinent part:

> Psychological testing does find a number of disturbed thought processes, typical of individuals who are quite emotionally disturbed. He seems to have a very poor fund of common information and intellectually, he appears to be functioning in the mild range of mental retardation. He tells me that he cannot handle money, nor can he go about the city on his own. Clinically, he appears to have an IQ of about 67.

Mental Health Evaluation, 7/29/05 at 2-3.[1]

In ***Commonwealth v. Cruz***, 852 A.2d 287 (Pa. 2004), our Supreme Court stated that, in some circumstances, mental incapacity could satisfy the newly-discovered fact exception:

> The essence of appellant's claim is that his alleged mental incapacity rendered the facts upon which his substantive PCRA claims would be based unknowable to him until the point at which he became competent, and thus qualifies him for review under the PCRA's after-discovered evidence exception to the PCRA time-bar. Appellant also claims that he should be permitted to attempt to prove that he filed his *pro se* PCRA

---

[1] This document was attached to the PCRA pleadings and the Commonwealth does not dispute its veracity.

petition within sixty (60) days of the point where he became competent. Although the lower courts are correct that there is no express exception for mental incapacity found in Section 9545(b)(1), we are satisfied that, in some circumstances, claims that were defaulted due to the PCRA petitioner's mental incompetence may qualify under the statutory after-discovered evidence exception.

*Id*. at 335–36.  Subsequent case law has described *Cruz* as follows:

Only under a very limited circumstance has the Supreme Court ever allowed a form of mental illness or incompetence to excuse an otherwise untimely PCRA petition.  Thus, the general rule remains that mental illness or psychological condition, absent more, will not serve as an exception to the PCRA's jurisdictional time requirements.

*Commonwealth v. Monaco*, 996 A.2d 1076, 1080–81 (Pa.Super. 2010)

(citations omitted).  Additionally, in *Commonwealth v. Liebensperger*,

904 A.2d 40, 47 (Pa.Super. 2006), we described *Cruz* as involving highly

unusual facts:

The unique facts of *Cruz* allow us to distinguish it from the instant case.  In *Cruz*, the appellant was essentially "lobotomized" as a result of a self-inflicted gunshot wound, and could not discuss the facts of his case.  In our case, Appellant suffered no similar physical injury to his brain.

*Id*. at 47.

Presently, we find that the materials relied upon by Appellant do not fit

the *Cruz* standard as he likewise has failed to establish any type of similar

physical injury that would prevent him from knowing the nature of his

claims.  Indeed, the facts contained in the July 2005 report do not establish

any type of mental incompetence.  Thus, assuming *arguendo* that Appellant

could not recover the mental health report in the exercise of due diligence

prior to 2011, the report fails to establish that Appellant's situation is comparable in any way to **Cruz**.

The essence of **Cruz** was that the petitioner could not participate meaningfully in his own proceedings during the relevant timeframes. Here, however, Appellant's documents establish only that his IQ is low, which does not satisfy the exception. **Liebensperger**, **supra** at 47 ("In his diagnostic impression, Dr. Rotenberg noted that Appellant suffered from . . . Mild Mental Retardation."). Furthermore, Appellant's own brief indicates that his mental capacities posed difficulties only in the sense that he required help from other inmates in preparing his documents, and he states that he has "the functioning mental state of a mentally retarded individual[.]" Appellant's brief at 7. That circumstance, however, does not establish that Appellant did not know the nature of his claims, as he avers in his brief. It means only that he had difficulties preparing his brief.

In this respect, accepting *arguendo* that Appellant's low IQ prevented his meaningful participation and excuses his failure to file a brief, it follows that he was forever unable to participate from the case's inception. Absent Appellant somehow improving his IQ in the intervening years, it would therefore seem that Appellant's mental capacities would still hinder his preparation.

Finally, Appellant fails to explain how he has now sufficiently recovered from his purported inability to meaningfully participate. Indeed, Appellant

does not state that his condition has somehow improved since the 2005 report.  As we explained in *Liebensperger*:

> Comparatively, Appellant in the instant case has offered nothing to indicate when, if ever, the crucial point in time at which he passed from incompetence to competence may have actually occurred, discussing only his chronic mental illness. Appellant has failed to offer any evidence or suggested reasons as to the cause of his lapse into incompetence after Dr. Rotenberg's evaluation. Similarly, Appellant has not asserted in his petition even an estimate of the timing or duration of the periods of incompetence he allegedly suffered after his evaluation. Further, Appellant has made no assertions, and there is nothing in the record to indicate, that his condition is of the type that may have recently improved or changed so that he has only recently returned to the degree of competence required to file a PCRA petition.

*Liebensperger*, *supra* at 48.

The same is true herein.  There is nothing in the record to indicate that his condition was of the type that (1) actually prevented his meaningful participation back in 2010 when his failure to file a brief resulted in the dismissal of his appeal, and (2) that the purported condition excusing his failure to file a brief has improved to a degree that he is now competent to do so where he formerly was not.  Therefore, we conclude that Appellant failed to establish the applicability of the exception, and we therefore affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/21/18